1
2
3
4
5
6
7

8                    UNITED STATES DISTRICT COURT

9                 CENTRAL DISTRICT OF CALIFORNIA

10                        WESTERN DIVISION

11
IMPERIAL   CREDIT   INDUSTRIES,    )    Case No. SA CV 07-777CAS
12  INC., a California corporation,      )
                                        )    **FINDINGS OF FACT AND**
13                                      )    **CONCLUSIONS OF LAW**
                    Debtor.             )
14  _____    )
                                        )
15  EDWARD M. WOLKOWITZ, as Trustee     )
16  for IMPERIAL CREDIT INDUSTRIES,     )
    INC., a California corporation,     )
17                                      )
                                        )
18                  Plaintiff,          )
19       vs.                            )
                                        )
20                                      )
    PERRY  A.  LERNER,  an  individual; )
21  SANTA MONICA PICTURES, LLC, a       )
    Delaware  limited  liability  company; )
22  CORONA  FILM  FINANCE  FUND,        )
23  LLC,  a  Delaware  limited  liability  )
    company;  and  DOES  1  through  40, )
24  inclusive,                          )
25                  Defendants.         )
                                        )
26                                      )
                                        )
27  _____    )

28

This case was tried to the Court on May 6-9, 15, 20-22, 27, 2008.  A. Matthew Ashley, Jared Gale, William Lobel, and Pamela Graham of Irell & Manella LLP appeared for plaintiff and Marc Rappel, Russell Sauer, Nathan Smith, and Anita Wu of Latham & Watkins LLP appeared for defendants.  Having carefully considered the record and the arguments of the parties, the Court finds and concludes as follows.[1]

## I.    INTRODUCTION & BACKGROUND

This case arises out of the sale of an interest in Corona Film Finance Fund, LLC ("Corona") to debtor Imperial Credit Industries, Inc. ("Imperial").  The sale was arranged by defendant Perry Lerner ("Lerner") while he was a member of Imperial's Board of Directors, and was intended to provide a tax loss for Imperial.  Imperial was at all times relevant to this action a corporation organized under the laws of the State of California.  Prior to filing for bankruptcy, Imperial was a publicly traded, diversified financial services company based in Torrance, California, that focused on the origination and sale of conforming residential mortgage loans.  Lerner served as a director of Imperial from 1992 until approximately 2001.

Defendants Corona and Santa Monica Pictures, LLP ("SMP") are each Delaware limited liability companies.  At the time of the Corona sale, Lerner owned .33% of Corona, .25% of SMP's common interest, and .985% of SMP's preferred interest.  Lerner also served as a managing member of SMP, and as tax matters partner for Corona.

The transaction here at issue had its genesis in Credit Lyonnais, S.A.'s  ('CL') investment in, and subsequent sale of Metro-Goldwyn-Mayer, Inc. ("MGM").  In 1993, CL restructured MGM by splitting it into two entities.  MGM was renamed MGM Group

---

[1] On May 26, 2008, defendants moved for judgment, pursuant to Fed. R. Civ. P. 52(c), on plaintiff's claims that (1) he is entitled to prejudgment interest prior to filing this case, (2) the Corona transaction was an interested director transaction, and (3) SMP is liable for breach of fiduciary duty and punitive damages.  For the reasons set forth herein, the Court denies in part and grants in part defendants' motion.

Holdings Corporation ("MGM Group Holdings"), and a new subsidiary, eventually named Metro-Goldwyn-Mayer Incorporated ("New MGM"), was created.  As part of the restructuring, the debt that MGM owed CL was divided between MGM Group Holdings, and New MGM.  MGM Group Holdings executed an unsecured promissory note in the amount of $965 million (the "$965 million note" or "receivable") payable to a subsidiary of CL.  In 1995, Generale Bank Nederlands ("GB") acquired the CL subsidiary that was the lender on the $965 million note.  In 1996, CL decided to sell New MGM.  Defendant Lerner and his business partner, employer, and financial backer, Peter Ackerman ("Ackerman"), made an unsuccessful bid for New MGM.[2]  CL eventually sold New MGM to an entity owned by financier Kirk Kerkorian for $1.3 billion.  This $1.3 billion sufficed to pay all of New MGM's creditors except for $79,912,955.34 of the $378,748,588.93 owed by New MGM to CL.

On October 9, 1996, CL, MGM Group Holdings, and New MGM executed a debt release and assumption agreement releasing New MGM from its obligations on the remaining $79,912,955.34 and providing that MGM Group Holdings would assume this debt.  MGM Group Holdings thereafter changed its name to Santa Monica Holdings Corporation ("SMH").  As a result of the assumption of New MGM's debt, SMH had the following major obligations: (1) the $965 million note owed to GB, and (2) the $79,912,955.34 ("the $79 million note" or "$79 million receivable") owed to CL.

After Lerner and Ackerman lost out on the bid for New MGM, they began negotiations with Rene-Claude Jouannet of Consortium de Realisation ("CDR") to enter into another transaction to monetize MGM Group Holdings.  Jouannet had been a director of MGM and was the representative of Credit Lyonnais in connection with the bidding process.  After lengthy negotiations, on or about December 10, 1996, SMP was organized as a partnership.  Ackerman, Lerner, and the Foreign Banks all had interests in SMP.

---

[2]At all relevant times Ackerman conducted his business activities through a wholly owned advisory company, Rockport Capital, Inc. ("Rockport"). Lerner was an officer in Rockport.

CL and SMP thereafter entered into an agreement, whereby CL contributed to SMP a film library and approximately $1.6 billion in receivables, including the $79 million note, for a price of $10 million to SMP.   Pursuant to an agreement with Ackerman, CL also acquired the right to "put" their interests in SMP to Ackerman for five million dollars.  CL exercised the "put," and Ackerman purchased CL's interests in SMP on December 31, 1996, just a few weeks after SMP was formed.  Later, SMP acquired additional non-descript film libraries, secured more than $145 million in capital, and entered into an agreement with Troma Entertainment, Inc. ("Troma"), an independent film producer and distributor.  SMP then exchanged its film library, including the films contributed to it by CL, for preferred and common stock in Troma.

On or about October 7, 1997, Lerner recommended to Imperial's Chief Financial Officer, Kevin Villani, that Imperial invest in and acquire a twenty-five percent interest in SMP.  Gubman Tr. 5/6 27:24-28:18.  To that end, Lerner made several presentations to Imperial's board of directors.  Gubman Tr. 5/6 32:2-8, 34:6-15. On or about November 19, 1997, Imperial's board or directors conditionally approved the investment in SMP. However, Imperial never invested in SMP, purportedly because the investment was larger than what Imperial wished to acquire.  Lerner later  facilitated Imperial's purchase of an interest in defendant Corona.  Gubman Tr. 5/6 58:18-20.

On or about November 5, 1997, defendant Lerner, his company Peridone Corp., and SMP formed Corona.  On November 7, 1997, at Lerner's direction, SMP contributed its $79 million receivable to Corona in exchange for a ninety-nine percent interest in Corona.  Then on December 11, 1997, Lerner recommended, to Imperial's General Counsel, Irwin Gubman, that Imperial  purchase a portion of SMP's interest in Corona instead of pursuing the previously recommended film investment transaction.  Gubman Tr. 5/6 46:2-18. At the time, Corona's only assets consisted of the $79 million receivable, and approximately $265,000 in cash.  Lerner represented that Imperial could reduce its taxable income by investing in Corona.  Gubman Tr. 5/6 35:10-25.  Imperial's board of directors approved the investment in Corona (the "Corona transaction"), purchasing a 79.2% interest therein, which

was later increased to 93.8%. Thereafter, Imperial invested approximately $15 million dollars in Corona, and Lerner caused SMP to withdraw that money from Corona. Lerner Tr. 5/20 32:17-33:4. The exact amount invested was $15,182,976; $212,000 paid on December 15, 1997, pursuant to the purchase agreement in the Corona transaction, $36,700 paid on December 31, 1997, pursuant to an amendment to the purchase agreement and $14,934,276 on January 12, 1998, as a tax sharing payment to SMP pursuant to Corona's operating agreement. Joint Pre-trial Order ¶ 28.

On December 29, 1997, Corona sold the $79 million receivable to TroMetro Films, LLC ("TroMetro"), an entity owned by Lerner's friend and business associate, John van Merkensteijn. Lerner Tr. 5/9 179:5-180:15. SMP later acquired certain TroMetro assets. Lerner caused Corona to declare a capital loss of $78,766,955 resulting from Corona's sale of the $79 million receivable to TroMetro. Lerner Tr. 5/15 12:2-22. Then, Lerner caused Corona to allocate $74,671,378 of that capital loss to Imperial. Lerner Tr. 5/20 92:7-10. Lerner also caused SMP to report a $73 million loss on the sale of its membership in Corona to Imperial. Lerner Tr. 5/15 14:16-19.

Thereafter, on or about January 24, 2003, the Internal Revenue Service ("IRS") sent a Notice of Tax Deficiency to SMP and Corona, disallowing SMP's and Corona's claimed capital losses. On July 17, 2003, Imperial filed a petition for relief under Chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 1101 et seq. First Am. Compl. ("FAC") ¶ 4. Imperial has no current business operations. The IRS sent Imperial a Notice of Tax Deficiency dated December 11, 2003, disallowing Imperial's aforementioned claimed capital loss.

On August 4, 2005, the bankruptcy court converted the Chapter 11 case into a Chapter 7 case, 11 U.S.C. §§ 701 et seq., and Edward M. Wolkowitz was appointed trustee. Id. On July 5, 2007, defendants moved to withdraw the reference of this adversary proceeding from bankruptcy court to district court. On September 7, 2007, in light of the parties' agreement to withdraw the reference, this Court granted defendants' motion. On January 18, 2008, plaintiff Edward M. Wolkowitz filed the operative SAC against defendants Lerner, SMP, Corona, and Does 1 through 40. The complaint alleges claims:

(1) to void a 1997 transaction between Corona and Imperial pursuant to Cal. Corp. Code § 310; (2) for breach of fiduciary duty; and (3) for declaratory relief.[3]

Defendants SMP, Corona and Lerner, acting as tax matters partner, challenged the IRS' decision through two actions filed in the United States Tax Court: <u>Santa Monica Pictures, LLC v. Commissioner of Internal Revenue</u>, Docket No. 6163-03 and <u>Corona Film Finance Fund, LLC v. Commissioner of Internal Revenue</u>, Docket No. 6164-03 (collectively, the "tax court action"). <u>Id.</u> Plaintiff alleges that on May 11, 2005, the tax court largely upheld the IRS' disallowance, and the penalties assessed against SMP and Corona. <u>Id.</u>

This lawsuit ensued. The gravamen of the plaintiff's complaint is two-fold. First, plaintiff alleges that the Corona transaction constitutes an unfair and unreasonable interested director transaction. Second, plaintiff alleges that Lerner breached his fiduciary duties to Imperial.

## II.    DISCUSSION

### A.    First Claim for Relief

Plaintiff seeks to void the Corona Transaction on the grounds that it constitutes an interested director transaction that was not fair and reasonable to Imperial. California Corporations Code § 310 governs the validity of a transaction involving a corporation and a director who has an interest in the transaction. It provides for a safe harbor for interested director transactions, which can nonetheless be validated if certain statutory prerequisites are satisfied. <u>See</u> Eric G. Orlinksy, <u>Corporate Opportunity Doctrine and Interested Director Transactions: A Framework for Analysis in an Attempt to Restore Predictability</u>, 24 Del. J. Corp. L. 451, n.5 (1999) (listing states with safe harbor statutes for interested director transactions); Bart Schwartz & Amy L. Goodman, 1 Corporate Governance: Law and Practice § 4.08 (2007) ("[G]eneral purpose of the conflict of interest statutes is to relax the

---

[3] The case, entitled, <u>Wolkowitz v. Lerner et al. (In re Imperial Credit)</u>, Case No. CV SA 03-19407 ES, was transferred by transfer order filed on July 12, 2007, from the Central District of California (Santa Ana Division).

common law rule that conflict of interest transactions were voidable and to establish that interested transactions will not be voidable solely as a result of a director's interest in the transaction, provided certain statutory requirements are met.").  Section 310 provides that a transaction involving an interested director is not necessarily void or voidable (1) if the material facts of the transaction are fully disclosed to or known by the shareholders, and the transaction is then approved by them; or (2) if the material facts of the transaction are disclosed to or known by the board of directors, which then approves the transaction, and the transaction is just and reasonable as to the corporation at the time that it is authorized. Cal. Corp. Code §§ 310 (a)(1)-(2).  Thus, a transaction involving an interested director is "automatically void or voidable on the ground a director is a party to the contract, unless certain alternative requirements [set forth in section 310(a)(1) or section 310(a)(2)] are met."  Gaillard v. Natomas Co., 208 Cal. App. 3d 1250, 1273 (1989).

In Sammis v. Stafford, 48 Cal. App. 4th 1935 (1996), the California Court of Appeal explained that

> Where a disinterested majority approves the transactions and there was full disclosure, section 310(a)(2) applies, and the burden of proof is on the person challenging the transaction.  Where, however, the approval was not obtained from a disinterested board vote, section 310(a)(3) applies and requires the person seeking to uphold the transaction to prove it was 'just and reasonable' to the corporation.

Id. at 943.  Compliance with Cal. Corp. Code § 310 prevents a party from invalidating a transaction based solely on the involvement of an interested director.  However, compliance with this section does not immunize the transaction from attack on other grounds.  Gaillard, 208 Cal. App. 3d at 1273.  Nor does compliance insulate a director from liability for breach of fiduciary duty.  Id.  Instead, a director defending against allegations of breach of fiduciary duty that are predicated on an interested director transaction must demonstrate that the transaction was entered in good faith and was fair to the corporation.  Id.; see also

Walczak v. EPL Prolong, Inc., 198 F.3d 725, 732 (9th Cir. 1999) (breach of fiduciary claim based on interested director transaction is governed by Cal. Corp. Code § 310).

The plaintiff bears the burden of proving that the Corona transaction was "a transaction between a corporation and one or more of its directors, or between a corporation and any corporation, firm or association in which one or more of its directors has a material financial interest." Cal. Corp. Code § 310(a). If plaintiff satisfies his burden, then the Corona transaction is presumptively invalid. Thus, the burden shifts to defendants to prove that material facts about the transaction and Lerner's interest were disclosed to or known by Imperial's board of directors when it approved the Corona transaction. If defendants establish disclosure, then plaintiff must demonstrate that the Corona transaction was unjust and unreasonable to Imperial when it was authorized. On the other hand, if defendants cannot establish disclosure, they must prove that the Corona transaction was just and reasonable to Imperial when it was authorized by the board of directors.

Thus, the Court must decide three issues. First, whether the Corona transaction involved a contract between Imperial and Lerner, or whether Lerner had a material financial interest in SMP. Second, whether Lerner disclosed, or the board of directors knew, all material facts about the Corona transaction and Lerner's interest when it authorized, approved, or ratified the Corona transaction. Third, and most important, whether the Corona transaction was just and reasonable to Imperial when it was entered into by the parties. In deciding these issues the Court is guided by the purpose of the principle requiring close scrutiny of transactions in which a director deals with his or her corporation:

> the protection of shareholders and creditors from unfair transactions by which officers or directors, and sometimes shareholders, attempt to milk the corporate assets to the detriment of creditors or shareholders who from ignorance of the facts, lack of corporate control, or other reasons, are unable to protect themselves.

Armstrong Manors v. Burris, 193 Cal.App.2d 447, 458-59 (1961) (applying Cal. Corp. Code § 820, which was replaced by Cal. Corp. Code § 310).

1.   **Whether the Corona transaction is an interested director transaction**

In this case, the parties disagree as to whether the Corona transaction constitutes an interested director transaction at all. Defendants contend SMP, not Lerner, was the contracting party in the Corona transaction. Plaintiff, on the other hand, argues that Lerner was a party to the contract because (1) he admitted the same; (2) he signed the contracts in his representative capacity; and (3) he signed the Corona Operating Agreement in his personal capacity.

A transaction or contract, directly or indirectly, between a director and the corporation of which he is a director, is not disinterested. See e.g., H. Marsh Jr., et al., Marsh's Cal. Corporation Law ("Marsh's Cal. Corp. Law") § 11.07 (4th ed. 2008) (stating that "where a contract is made directly with an individual director" then the first prong is satisfied and section 310 applies, but that the more difficult question is whether the second prong of section 310 applies). It does not appear that the Corona transaction was a transaction between Imperial and Lerner. Rather, it was a transaction between Imperial and SMP.[4]

Next, the Court considers whether the Corona transaction was a transaction between Imperial and a "corporation, firm or association in which [Lerner] ha[d] a material financial interest." Cal. Corp. Code § 310(a). Section 310 defines an interested director as one who has a "material financial interest" in a contract or transaction. However, "material financial interest" is not defined by the California Corporations Code. The absence of a more specific definition appears to be deliberate. According to Marsh's California Corporation Law, the California Legislature did not more specifically define the statutory phrase material interest because "[t]he Drafting Committees believed that any attempt to provide mathematical rules

---

[4]The Corona Operating Agreement was signed by Lerner in his individual capacity. The Corona Operating Agreement merely provides consent to amendments to the Corona Operating Agreement as was required to effectuate the transaction. These facts do not alter the Court's conclusion that this was not a transaction between Imperial and Lerner.

would be unwise because of the infinite variety of circumstances which may exist." Marsh's Cal. Corp. Law § 11.07.  As such, under California law, courts must conduct a case-by-case analysis to determine whether a director has a sufficiently substantial financial interest in the entity contracting with the corporation.  See 1-6 Ballantine & Sterling, California Corporation Laws ("Ballantine & Sterling") § 103 n.8; 6 Cal. Prac. Guide: Corporations 6:288(2)(a); Marsh's Cal. Corp. Law § 11.07 (4th ed. 2008).  The court must look at all the circumstances and decide whether a particular director's interest in the entity with which the director's corporation contracts is material.[5]  Marsh's Cal. Corp. Law § 11.07.  For example, "courts generally find such an interest when a person has an expectation of pecuniary gain." Harvey v. Landing Homeowners Ass'n, 162 Cal. App. 4th 809, 824 n.10 (2008) (involving duties owed to nonprofit corporation finding that interest in a "valuable asset" was not sufficient); Michael v. Aetna Life & Casualty Ins. Co., 88 Cal. App. 4th 925, 942-43 (2001); Sammis v. Stafford, 48 Cal.App.4th 1935, 1941 (1996).

Lerner was a member of Imperial's board of directors from Imperial's inception in 1992 through at least April 2001.  From 1996 until 2006, Lerner was the manager of defendant SMP.  The Corona transaction was entered into in late December 1997 and early January 1998, while Lerner was a director of Imperial and a manager of SMP.  Lerner was a director of Imperial during the proposal, consideration, closing, and implementation of the Corona Transaction.

During the period of time relevant herein, Lerner had a personal pecuniary interest in SMP and Corona.  Lerner had a .59% interest in SMP and a one percent interest in

---

[5] Defendants argue that for the Corona transaction to be considered an interested director transaction, plaintiff must prove that Lerner received some form of monetary compensation tied directly to the transaction.  Section 310 does not, however, require an expectation of pecuniary gain from the transaction itself.  Instead, the statute requires that the director have some financial interest in the contracting entity, SMP in this case.  Even if the defendant's construction of Section 310 was correct, the Corona transaction would still constitute an interested director  transaction because Lerner received approximately $980,000 of the $14,934,276 tax sharing payment Imperial made to defendants.

Corona, which defendants contend is <u>de</u> <u>minimis</u>.   However, Lerner also acted as a managing member for SMP.  In 1998, the year that Imperial made the tax sharing payment, SMP distributed $1.45 million in cash to Lerner and SMP's wholly owned subsidiary, Somerville LLC, also loaned $2 million to Lerner.[6]   Lerner also received a salary of approximately $750,000 to $800,000 per year from 1997 to 2000, which included compensation for Lerner's work on Corona.[7]  Of the $14,934,276 tax sharing payment made by Imperial to Defendants, at least $980,000 of it went to Lerner. Lerner admits, as he must, that "the source of this payment was the tax sharing payment."  Lerner Tr. 5/20 33:12-22; 34:15-18.  Although Lerner contends that "once the payment [by Imperial] had been made to Ackerman, it was Ackerman's money,"  Lerner's explanation is not inherently credible, given Lerner's business relationship with Ackerman, his role with respect to the Corona transaction, and the timing of this payout.  <u>Id.</u> 34:15-18. Further, Lerner received most, if not all, of his compensation from Ackerman and his companies, one of which was SMP. Lerner understood that he was Ackerman's employee.  Lerner Tr. 5/19 21:14-18.  Indeed, Lerner admitted that he felt uneasy about the Corona transaction precisely because he had a conflict of interest.  <u>See</u> <u>e.g.</u>, Lerner Tr. 5/19 192:13-14.  He therefore abstained from voting on the resolution of Imperial's board of directors approving the transaction.[8]  There can be no doubt that in light of this evidence Lerner had a material interest in SMP, and that his duties to Imperial were compromised by his conflicting self-interest and loyalty to SMP, Corona, and Ackerman.[9]

**2.    Whether material facts were disclosed or known**

---

[6] Lerner Tr. 5/20 32:5-13. Although Lerner claims he repaid this purported loan he has not produced any documents to support this assertion.

[7] Lerner Tr. 5/20 21:3-11.

[8]Abstaining from voting does not by itself make the transaction just and reasonable or obviate the need for disclosure of material facts.  <u>See</u> Cal. Corp. Code § 310(a)

[9] Both parties agree that critical question is whether Lerner's alleged interests in fact influenced or were likely to influence his judgment.  The Court agrees.

Next, the Court turns to whether the material facts about the Corona transaction were disclosed to or known to the board of directors.[10]  Again, the term "material" is not defined in the California Corporations Code.  Ballantine and Sterling suggests that a court should look to the federal securities laws, and therefore concludes that material information is information that would have likely affected the deliberations of a reasonably prudent board member.  1-6 Ballantine and Sterling § 103.

Critical to this case is the fact that Lerner did not disclose, as tax matters partner for SMP and Corona, and Imperial did not know, that SMP was going to duplicate the tax loss on the sale of its membership interest in Corona to Imperial.  Further, Lerner did not disclose, and Imperial did not know, that there were serious questions as to whether Lerner and Ackerman and their entities (collectively "Rockport"), on the one hand, and the Foreign Banks, on the other hand, had an intent to partner in SMP.[11]  Instead, the creation of SMP was in reality a sale of $1.6 billion in tax losses, not the formation of a partnership.  In fact, the KPMG partner who supervised the transaction testified that if KPMG had known there was no intent to partner, KPMG would not have signed Imperial's return or provided a 33% to 50% opinion. Garigliano Tr. 5/12 11:18-12:3.  Additionally, though not necessary to the Court's finding herein, Lerner did not disclose, and Imperial's board of directors did not know of the existence of the Davis Polk memorandum opining that the IRS was likely to disallow the tax losses.  Finally, Lerner did not disclose, and the board of directors did not know, that Lerner was to receive $980,000 of the $15,182,976 that Imperial paid in the Corona transaction.  The Court therefore concludes that material facts about the Corona transaction and Lerner's interest therein were not disclosed to Imperial's board of directors.

3.     **Whether the Corona transaction was just and reasonable as to Imperial**

---

[10] Disclosure is relevant only for purposes of determining who bears the burden of proof on the just and reasonableness, or lack thereof, of the Corona transaction.

[11] E.g. Lerner Tr. 5/15 104:3-7, 128

1   Finally, the Court turns to the issue of whether the Corona transaction was fair and

2   reasonable to Imperial.  The essence of the test is whether or not under all the circumstances

3   the transaction carries the earmarks of an "arm's length bargain."  <u>Remillard Brick Co. v.</u>

4   <u>Remillard-Dandini Co.</u>, 109 Cal. App. 2d 405, 420 (1950); <u>Jones v. H.F. Ahmanson & Co.</u>,

5   1 Cal. App. 3d 93, 108-09 (1969).  Fairness is judged at the time the contract was

6   "authorized, approved or ratified."  Cal. Corp. Code § 310(a)(2)-(3).  In making its decision,

7   the court must look to the totality of the circumstances.  For example, some courts look to

8   whether the transaction involved fair price terms and fair dealings.  <u>See</u> <u>e.g.</u>, <u>Tevis v. Beigel</u>,

9   174 Cal. App. 2d 90, 97-98 (1959).  Further, whether Imperial in fact made a profit or

10  gained some economic benefit from the Corona transaction does not render an otherwise

11  unfair and unjust bargain permissible.  <u>Reimillard Brick Co.</u>, 109 Cal. App. 2d at 420-21.

12  Nonetheless, the Court finds that even if material facts had been disclosed by Lerner, the

13  Corona transaction must be set aside because plaintiff has demonstrated that it was not just

14  and reasonable to Imperial.

15  In this regard, Lerner and Ackerman purchased the film library and one hundred

16  percent of the $1.6 billion in tax losses, for $10 million.  Just one year later, Imperial paid

17  Lerner and Ackerman approximately $15 million for 4.9% of those same tax losses.

18  Further, Imperial did not know that SMP would write off, and thereby duplicate, the same

19  tax losses that were sold to Imperial, thus making disallowance by the IRS highly likely and

20  rendering the transaction even less valuable.[12]  By duplicating these tax losses, Lerner and

21  Ackerman in fact gave up nothing in their sale.  Also probative is the fact that defendants

22

23  [12]Defendants contend that Jerry Rokoff of Shearman & Sterling LLP, told Lerner and
    Ackerman that he believed if the tax losses were ever challenged by the IRS, it was 90%

24  likely that they would be upheld.  Lerner Tr. 5/15 202:15-22.  At his deposition,  Rokoff

25  testified that he told Lerner and Ackerman that they were not "dead in the water."  Lerner
    disputed Rokoff's version of the facts.  When asked why he did not solicit an opinion,

26  memorandum, or letter memorializing the  90% likely opinion, Lerner responded that
    "Shearman and Sterling at the time was very busy doing a number of other things...and

27  [Lerner] didn't want to distract them from the work they were doing at the time."  Lerner

28  Tr. 5/15 210:22-211-12.

tried to market the tax losses to third parties, but none of those third parties dealing at arms length would agree to enter into the proposed deals.  The only party that Lerner and Ackerman could get to accept the deal was Imperial.  The Court therefore finds that the Corona transaction was unfair and unreasonable because of the non-disclosures and misrepresentations set forth above and because it was grossly overpriced and structurally deficient.

Having decided that the Corona transaction was unfair and unreasonable under section 310, the Court finds that absent some valid affirmative defense, Imperial may avoid the transaction.

**B.     Second Claim for Relief**

Plaintiff's second claim for relief is against Lerner for breach of fiduciary duty. Plaintiff must therefore prove that Lerner breached a fiduciary duty he owed to Imperial, and that the breach of that duty proximately damaged Imperial.  See Stanley v. Richmond, 35 Cal. App. 4th 1070, 1086 (1995); Mendoza v. Rast Produce, 140 Cal. App. 4th 1395, 1405 (2006).

Under California law, a director of a California corporation is a fiduciary.  Remillard Brick Co., 109 Cal. App. 2d at 419; American Trust Co. v. California Western States Life Ins. Co., 15 Cal. 2d 42, 62-63 (1940); Jones v. H. F. Ahmanson & Co., 1 Cal. 3d 93, 108 (1969).  In this case, it is undisputed that Lerner was a director of Imperial and therefore owed it fiduciary duties.

In California, Cal. Corp. Code § 309 defines the standard for determining the personal liability of a director for breach of his fiduciary duty to a corporation.  Cal. Corp. Code § 309.  It provides that a director may not act in his or her self-interest when dealing with the corporation.  Rather, the director must act in "good faith" and "in the best interests of the corporation and its shareholders."  Cal. Corp. Code § 309(a); Lawrence v. I.N. Parlier Estate Co., 15 Cal .2d 220, 229 (1940); Efron v. Kalmanovitz, 226 Cal. App. 2d 546, 556 (1964). "The director cannot, by reason of his position, drive a harsh and unfair bargain with the corporation he is supposed to represent."  Remillard Brick Co. v. W.S. Stanley et al., 109

14

Cal. App. 2d 405, 418-19 (1952).  Indeed, "[i]t is a cardinal principle of corporate law that a director cannot, at the expense of the corporation, make an unfair profit from his position." Id. at 420.  In the context of an interested-director transaction, a breach of fiduciary duty is established if it is shown that the interested director transaction was not fair and reasonable to the corporation.  Id. at 418; 1975 Legislative Comm. Comment to Corp. Code § 310.

The Court finds that Lerner breached his duties to Imperial.  Specifically, for the reasons stated above, Lerner proposed an unfair and unreasonable transaction to Imperial. There is also evidence to suggest that Lerner intended on making the transaction "very expensive" for Imperial.  Lerner Tr. 5/15 179: 9-24.  Further, once Lerner had knowledge of the Davis Polk memorandum, which was prior to the time that Imperial took the tax losses, he should have further inquired about potential harm to Imperial or, the very least, informed Imperial of the Davis Polk memorandum.  See Burt v. Irvine Co., 237 Cal. App. 2d 828, 852-53 (1965).  Additionally, Imperial requested a clawback provision.  Lerner's own attorneys at Sherman & Sterling also suggested a clawback provision for Imperial. Lerner Tr. 5/20 66: 2-25.  Not only did SMP deny Imperial's request, but also Lerner never told Imperial that Sherman & Sterling had recommended the clawback.  Lerner Tr. 5/20 67: 23-68:4.  These facts establish that Lerner breached his fiduciary duties to Imperial.

Defendants contend that even assuming arguendo Lerner breached his fiduciary duties, plaintiff's instant claim fails because Imperial was not proximately damaged by Lerner's breach of fiduciary duty.  Defendants contend that the IRS alternatively disallowed Imperial's losses on two grounds independent of SMP's conduct.  Defendants argue that Imperial's use of treasury repurchase transactions to increase its basis in its Corona investment and the absence of a non-tax business purpose for its investment in Corona were independent causes of damage.  However, plaintiff's theory in this case is not based on the disallowance of the losses, but rather on whether the Corona transaction was fair and reasonable and whether Lerner disclosed all material facts pertaining to it.  Therefore, the relevant damages are the amounts paid on the Corona transaction, which plaintiff properly alleges was proximately caused by Lerner's breach.

C.     **Affirmative Defenses**

1.     **Laches**

Defendants assert that the affirmative defense of laches bars plaintiff any right to relief.[13] "It is well settled that the corporation and the shareholders may and will lose the right to have the contract or transaction set aside by laches in exercising their option to disaffirm it, unless the delay is satisfactorily explained." Fletcher Cyclopedia § 986 (footnotes omitted) (citing Robertson v. Hartman, 6 Cal 2d 408, 412-13 (1936)). To prove their laches defense, defendants must establish (1) a failure to file a claim; (2) for a period of time that amounts to an unreasonable delay; (3) the delay results in prejudice to the defendant. People v. Koontz, 27 Cal.4th 1041, 1087-88 (2002).

Defendants claim that Imperial knew, or should have known, about the facts giving rising to this action by the time the parties closed the transaction in 1997, or, at the very latest in 2002 when the IRS disclosed its investigative report. Specifically, defendants claim that by the time the Corona transaction was concluded in 1997, Imperial had possession of all the documents upon which it now relies to assert that Lerner was a "party" to the transaction, and that it knew the precise nature of Lerner's relationship with, and interest in SMP, Corona, and the Ackerman entities. Imperial also knew by the time the transaction closed that KPMG had not issued the "more likely than not" opinion required by a resolution of Imperial's board of directors approving both the SMP and Corona transactions. According to Freddy Reiss, plaintiff's pricing expert, it should have been obvious to Imperial that the Corona transaction was not just and reasonable as soon as KPMG refused to give the "more likely than not" opinion that Imperial's board of directors required. Imperial knew at the time of the Corona

---

[13] The defense of laches applies to the trustee's action because "the [bankruptcy] estate is comprised of all legal or equitable interests of the debtor in property as of the commencement of the case. To the extent such an interest is limited in the hands of the debtor, it is equally limited in the hands of the estate except to the extent that defenses which are personal against the debtor are not effective against the estate." In re Thomas 147 B.R. 526, 534 (BAP 9th Cir. 1992) (citing the legislative history).

Transaction that Lerner and Ackerman paid $10 million for the $1.6 billion in tax losses, film library, and Carloco securities. Gubman Tr. 5/6 30:7-13. Defendants claim that plaintiff's failure to file this until about July 11, 2005, constitutes an unreasonable delay. According to defendants, this delay has prejudiced them because Imperial's directors and officers insurance policy has lapsed, Jouannet passed away, memories have faded, and documentary evidence has been lost.

Plaintiff contends that laches does not apply for several reasons. Plaintiff argues that laches is inapplicable where the party asserting that defense has hidden material facts as Lerner clearly did here. Topanga Corp. v. Gentile 249 Cal.App.2d 681, 689 (1967) ("Nor could the doctrine of laches have application since a defendant is not permitted to complain in equity about a plaintiff's failure to discover promptly a fraud committed against him where the plaintiff's lack of knowledge is the result of the defendant's success in concealing it").

Plaintiff further contends that there was no unreasonable delay in bringing suit because Imperial did not know of or suspect wrongdoing until the IRS issued its investigation report in Fall 2002. Plaintiff acknowledges that Imperial (1) knew in 1997 that the Corona transaction could be disallowed, (2) learned after the vote on the Corona transaction that KPMG reached a 33%-50% opinion and not a 51+% opinion, and (3) knew in 2000 that the IRS was auditing the transaction. However, plaintiff contends that while this knowledge provided Imperial with notice that the tax losses might be disallowed, it did not provide notice of the unfair price in light of the material non-disclosures such as the loss duplication, the Davis Polk opinion, and the misleading documents provided to KPMG.[14] The Court finds plaintiff's arguments persuasive. While Imperial certainly delayed in unwinding the Corona transaction, the injury of which it complains is tied to Lerner's misrepresentations, not the disallowance of the

[14] Plaintiff contends that bankruptcy law provides Imperial with a two-year tolling period to file any claims that had not expired as of the bankruptcy petition date of July 17, 2003. Because Imperial filed this action within the two year tolling period, plaintiff contends that any laches was tolled as a matter of law on July 17, 2003.

losses.  Plaintiff credibly demonstrates that Imperial was not put on notice of the material misrepresentations until it received the IRS' investigation report in fall 2002. Given that plaintiff filed this claim on July 14, 2005, with an effective filing date of July 14, 2003, Imperial's delay was not per se unreasonable.

Even assuming arguendo that plaintiff's delay is unreasonable, the Court is not convinced that defendants have suffered prejudice.  Defendants have failed to demonstrate that they would have been covered by Imperial's directors and officers insurance policy.[15]  Furthermore, while memories have undoubtedly faded, the documentary evidence and witnesses available at trial were sufficient and did not prejudice defendants.

### 2.    Unclean Hands

The doctrine of unclean hands "bars relief to a plaintiff who has violated conscience, good faith or other equitable principles in his prior conduct, as well as to a plaintiff who has dirtied his hands in acquiring the right presently asserted." Dollar Sys., Inc. v. Avcar Leasing Sys., Inc., 890 F.2d 165, 173 (9th Cir. 1989).  The plaintiff's alleged misconduct must relate directly to the transaction that gave rise to the claim for relief. Id.  Courts do not apply the doctrine where the plaintiff's actions did not cause the defendant to suffer serious harm.  Chitkin v. Lincoln Nat'l Ins. Co., 879 F. Supp. 841, 853 (S.D. Cal. 1995).  Similarly, under the doctrine of in pari delicto "a plaintiff who participated in the wrongdoing cannot recover when he suffers injury as a result of that wrongdoing." Memorex Corp. v. Int'l Bus. Machines Corp., 555 F.2d 1379, 1381 (9th Cir. 1977); see also Doe I v. Reddy, 2003 U.S. Dist. LEXIS 26120, at *27 (N.D. Cal. 2003) (in pari delicto "is a common-law doctrine which bars a plaintiff's recovery due to his own wrongful conduct").

In Pinter v. Dahl, 486 U.S. 622 (1988), the Supreme Court explained the interrelatedness of these two doctrines:

---

[15] Imperial's D&O insurance policy is not part of the record.

Traditionally, the [defense of in pari delicto] was limited to situations where the plaintiff bore at least substantially equal responsibility for his injury, and where the parties' culpability arose out of the same illegal act.  Contemporary courts have expanded the defense's application to situations more closely analogous to those encompassed by the unclean hands doctrine, where the plaintiff has participated in some of the same sort of wrong-doing as the defendant.

Id. at 632 (internal quotations and citations omitted).

In Goodell v. Verdugo Canon Water Co., 138 Cal. 308 (1903), the California Supreme Court stated that neither, laches, negligence, nor the doctrine of estoppel could be asserted against the corporation on the grounds that the interested board of directors failed to set a aside an unjust transaction while receiving its benefits.  Id. at 314-15; Tiedje v. Aluminum Taper Milling Co., 296 P.2d 554 (1956) (where at the time of entering into the invalid agreement with the defendant company, the shareholder claimed he did not know he was purchasing the stock out of earned surplus, the court found that there was a question of fact as to whether "there is no parity of delictum, one party having no duty under the law and having the right to assume that the other party, who has a duty, has complied with the law may resort to the courts though the illegal transaction has been completed").

Defendants argue that unclean hands should apply because Imperial engaged in illegal straddle transactions in an attempt to increase its basis in the allocated loss from the sale of the $79 million note, aggressively pursued tax loss opportunities and approached Lerner and Ackerman about doing another deal after discovering that there was no KPMG opinion, and allegedly lying to the IRS.  Assuming arguendo that all of defendants' allegations of misconduct are true, unclean hands would not apply because defendants have failed to allege that they have suffered any serious harm as a result.

Furthermore, the Court finds the application of unclean hands unwarranted here because Imperial did not have a hand in the interested director transaction. Even if

1   Imperial was aggressively pursuing tax shelters, it would not have entered into the

2   Corona transaction had it known that the loss would be duplicated.  Again, this case is

3   not about the disallowance of the losses, which was based in part on Imperial's conduct,

4   but rather whether the Corona transaction was fair and reasonable and whether all

5   material facts pertaining to it were disclosed.

6                          **3.   Statute of Limitations**

7        The statute of limitations for both section 310[16] and breach of fiduciary duty[17] is

8   the catch-all provision of four years.  Code Civ. Proc. § 343.  Further, as relevant here,

9   "[t]he discovery rule protects those who are ignorant of their cause of action through no

10  fault of their own.  It permits delayed accrual until a plaintiff knew or should have

11  known of the wrongful conduct at issue."  <u>April Enterprises, Inc. v. KTTV</u>, 147 Cal.

12  App. 3d 805, 827-28 (1983).  However, in cases involving fiduciaries, "the duty to

13  investigate may arise later by reason of the fact that the plaintiff is entitled to rely upon

14  the assumption that his fiduciary is acting in his behalf."  <u>Eisenbaum v. Western Energy

15  Resources, Inc.</u>, 218 Cal.App.3d 314, 325 (internal citations and quotations omitted).

16       Plaintiff filed its complaint on July 14, 2005, with an effective filing date of July

17  14, 2003, under 11 U.S.C. § 108(a).  <u>Huennekens v. Nicoll (In re Southern Int'l Co.)</u>,

18  159 B.R. 192, 193 (Bankr. E.D. Va. 1993); <u>In re Coin Phones, Inc.</u>, 153 B.R. 135, 142

19  (Bankr. S.D.N.Y. 1993).  Defendant contends that plaintiffs knew sufficient facts to

20  initiate a claim before July 1999, because they were put on notice that the Corona

21  transaction was not just and reasonable.  Plaintiff responds that it was put on notice that

22  the losses might be disallowed, but it did not suspect any wrongdoing until it received

23  the IRS examiner's report in fall 2002, which disclosed hidden facts such as the

24  duplication of the tax loss.  Given the relaxed "discovery rule" for cases involving

25  ─────────────────

26       [16] <u>FDIC v. McSweeney</u>, 976 F.2d 532, 536 n.3 (9th Cir. 1992) (cited with approval
     in <u>Briano v. Rubio</u>, 46 Cal. App. 4th 1167, 1169 (1996)).

27       [17] <u>See</u> <u>Lehman v. Superior Court</u>, 145 Cal. App. 4th 109, 120-21 (2006).

28

fiduciaries, the Court finds the plaintiff's argument persuasive. Plaintiff's cause of action did not accrue until fall 2002 and therefore is not barred by the statute of limitations.

### D.    Relief to Which Plaintiff is Entitled

#### 1.    Voiding the Corona transaction

The Court notes that a transaction's noncompliance with Cal. Corp. Code § 310 does not render the transaction "void," but "voidable" at the option of the corporation. Marsh's Cal. Corp. Law § 11.07 (citing Fudickar v. East Riverside Irrigation Dist., 109 Cal. 29, [] (1895). New Blue Point Mining Co. v. Weissbein, 198 Cal. 261, 269-70 (1926)); Todd v. Temple Hospital Ass'n, 96 Cal.App. 42, 46 (1928); 1-6 Ballantine and Sterling California Corporation Laws § 979 (stating that general rule is that a contract or other transaction between a corporation and its directors or other officers is merely voidable at the option of the corporation and not absolutely void). As discussed supra, the Corona transaction was an interested director transaction and was not just and reasonable to Imperial at the time its board voted to approve it. As such, the transaction is voidable at the election of the corporation and hereby declared void.

#### 2.    Damages

Plaintiff's damages resulting from his first claim under § 310 and his second claim for breach of fiduciary duty are the same: the $15,182,96 paid. Joint Pre-trial Order ¶ 28. Defendants argue that Imperial was not damaged by the Corona transaction and in fact received a $16 million net benefit because Imperial, now bankrupt and without any business operations, will never pay the IRS taxes and penalties assessed from the disallowance of the Corona transaction. This argument is not persuasive. The Supreme Court has held that reduction of damages by tax savings is improper. Randall v. Loftsgaarden, 478 U.S. 647, 660 (1986). Defendants contend that Randall left open the possibility that such a reduction might be allowed where tax benefits were the primary motivation for s party's investment or represented a large portion of the purchase price. Id. at 666-67. However, defendants acknowledge that courts have extended Randall's

holding in a variety of contexts, including claims for breach of contract, negligent misrepresentation, and fraudulent misrepresentation. This Court declines to find an exception to <u>Randall</u> in the instant case. Plaintiff properly points out that the trustee is prosecuting this action on behalf of Imperial's bankruptcy estate and is attempting to marshal assets for the benefit of Imperial's creditors. As such, plaintiff does not accrue a benefit when the IRS, a creditor, is not paid. Furthermore, it makes little sense to allow the defendants to take advantage of Imperial's bankruptcy filing and reduce plaintiff's damages by the amount Imperial is unable to pay the IRS. <u>See</u> <u>Stanley v. Trinchard</u>, 500 F.3d 411, 420 (5th Cir. 2007).

### 3. Punitive Damages

Plaintiff seeks punitive damages against Lerner and SMP. To award punitive damages, the Court must find "clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice." Cal. Civ. Code § 3294(a). Punitive damages are typically not awarded for unintentional torts and have been disallowed where the defendant's conduct was "merely in bad faith or overzealous" or where the defendant "took action to protect or minimize the injury to the plaintiff." <u>Lackner v. North</u>, 135 Cal. App. 4th 1188, 1212 (2006). Lerner failed to disclose material facts, but he did not do so with the intent to injure Imperial. Cal. Civ. Code § 3294(c)(3). While Lerner certainly did not exercise due care, taking Lerner's actions as a whole, including his recusal from voting on the Corona transaction, the Court cannot conclude that he acted fraudulently or maliciously.[18] Therefore, the Court declines to award punitive damages.

---

[18] Plaintiff argues that if the Court finds Lerner's nondisclosures material, it must award punitive damages. <u>Black v. Shearson, Hammill & Co.</u>, 266 Cal. App. 2d 362, 367 (1968) ("Intentional failure to disclose a material fact is actionable fraud if there is a fiduciary relationship giving rise to a duty to disclose it"). However, <u>Black</u> construes Cal. Civ. Code § 1710, which applies to deceit. In the instant case, Cal Civ. Code § 3294 (c)(3), which defines fraud for the purposes of exemplary damages, is more on point and requires an intent to injure.

### 4. Interest

#### i. Prejudgment Interest under Civil Code § 3287

Under California law, an award of prejudgment interest is governed by Civ. Code §§ 3287 and 3288. Civil Code § 3287(a) reads in relevant part:

> Every person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in him upon a particular day, is entitled also to recover interest thereon from that day.

Cal. Civ. Code § 3287(a). The Court must therefore determine if Imperial's damages were capable of being made certain by calculation and if so, when its rights vested.

#### a. Certainty of Damages

"[P]rejudgment interest must be granted as a matter of right if, as a matter of law, damages are "certain, or capable of being made certain by calculation."" Levy-Zentner Co. v. Southern Pac. Transportation Co., 74 Cal. App. 3d 762, 797 (1977) (footnote omitted). Applying § 3287(a), the California Court of Appeal has held that "where damages can be ascertained only by a judicial determination upon conflicting evidence as to the amount due, the defendant cannot be held to have known the amount he owed and thus cannot be subject to prejudgment interest upon the sum eventually awarded." Nicholson-Brown, Inc. v. City of San Jose, 62 Cal. App. 3d 526, 533 (1976). Furthermore, cases in which "there is a large discrepancy between the amount of damages demanded in the complaint and the size of the eventual award, that fact militates against a finding of the certainty." Polster Inc. v. Swing, 164 Cal. App. 3d. 427, 435 (1985). The focus of the inquiry is whether defendant knew or could have determined the amount of the claim from reasonably available information. Chesapeake Industries, Inc. v. Togova Enterprises, Inc., 149 Cal. App. 3d 901, 907 (1983).

Defendants argue that plaintiff has "vacillated repeatedly" about what it is owed and why. In his July 14, 2005 complaint, plaintiff states that Imperial suffered actual damages in excess of $26 million. In his April 4, 2006 amended complaint, plaintiff

states that Imperial suffered damages in excess of $15 million. Defendants argue that plaintiff proposes the remedy of returning the money Imperial paid, $15,182,976, plus interest, for the first time in his memorandum of contentions of fact and law.

Defendants' arguments are not persuasive. In plaintiff's second amended complaint he makes clear that he is seeking $15 million and any additional damages that the Court might find appropriate. SAC at 16. The ultimate amount of damages this Court finds is the $15,182,976 that Imperial paid in the Corona transaction. Joint Pre-trial Order ¶ 28. Given how close the claim of damages and the actual damage award are and the straightforward nature of the remedy, the Court concludes that the damage amount was capable of being made certain by calculation. Koyer v. Detroit F & M Ins. Co., 9 Cal.2d 336, 345-46 (holding that a dispute as to the amount of alleged damages did not prevent those damages from being made certain by calculation where the amount of recovery closely approximated plaintiff's claims).

### b.    Vesting of Rights

Defendants argue further that any prejudgment interest amount could not have vested before Imperial filed its complaint. By contrast, plaintiff argues that Imperial's rights vested when they entered into the Corona transaction because it was void at the outset. However, as discussed supra, the contract was not void at the outset as an interested director transaction, but voidable. Therefore, Imperial's rights under plaintiff's first claim for relief did not vest until it elected to void the contract by filing suit on July 14, 2005.

However, Imperial's rights under plaintiff's second claim did not vest at the same time as its first claim. For breach of fiduciary duty claims, rights vest, for purposes of § 3287(a), when the breach occurs and payment is made. See Nordahl v. Department of Real Estate, 48 Cal. App. 3d. 657, 665-66 (1975); N. Oakland Med. Clinic v. Rogers, 65 Cal. App. 4th 824, (1998). As such, prejudgment interest is owed on plaintiff's second claim from the time that the Corona transaction was entered into. Defendants therefore owe prejudgment interest on 1) $212,000 from December 15, 1997, 2) $36,700 from

24

December 31, 1997, and 3) $14,934,276 from January 12, 1998.  Joint Pre-trial Order ¶ 28.

Plaintiff must elect between recovery on his first and second claims because the remedies under these claims are inconsistent.  If plaintiff chooses to proceed under his first claim, he is entitled to prejudgment interest on $15,182,976 from July 14, 2005.  If plaintiff chooses to proceed under his second claim, he is entitled to prejudgment interest on (1) $212,000 from December 15, 1997, (2) $36,700 from December 31, 1997, and (3) $14,934,276 from January 12, 1998, or a total of $15,182,976.  Joint Pre-trial Order ¶ 28.

### ii.     Prejudgment Interest under Civil Code § 3288

Civil Code § 3288 provides that "[i]n an action for the breach of an obligation not arising from contract, and in every case of oppression, fraud or malice, interest may be given, in the discretion of the jury."  Although his Court determined supra that Lerner's actions did not amount to fraud, they certainly were in breach of an obligation not arising from contract.  Plaintiff's second claim for breach of fiduciary duty claims is a tort claim and prejudgment interest is available on any resulting damages under § 3288.  Nordahl, 48 Cal. App. 3d. at 665.  Similarly, plaintiff's first claim under § 310 is an action for the breach of a non-contractual obligation.  Defendants argue that it would be inequitable to award prejudgment interest because Imperial unreasonably delayed and adopted a wait-and-see approach.  As discussed supra, this Court does not find Imperial's delay unreasonable given that plaintiff's suit is over material non-disclosures and breach of fiduciary duty as opposed to disallowance of the tax losses.

Therefore, this Court alternatively awards prejudgment interest under § 3288.  If plaintiff elects to proceed under his second claim, he is entitled to prejudgment interest on 1) $212,000 from December 15, 1997, 2) $36,700 from December 31, 1997, and 3) $14,934,276 from January 12, 1998.  Joint Pre-trial Order ¶ 28.  If plaintiff elects to proceed under his first claim, he is entitled to prejudgment interest on $15,182,976 from July 14, 2005.

### iii.    Compound Interest

Compound interest is generally not awarded in California absent a stipulation by the parties or a special statutory provision.  State v. Day, 76 Cal. App. 2d 536, 554 (1946). Plaintiff argues that compound interest is appropriate because defendants are guilty of fraud and because Imperial had to borrow money at the compound interest rate. As discussed supra, the Court does not find defendants' conduct fraudulent and otherwise declines to award compound interest.

## III.    CONCLUSION

In accordance with the foregoing, the Court finds for Plaintiff on his first claim under Cal. Civ. Code § 310 and his second claim for breach of fiduciary duty. Defendants are ordered to pay damages of $15,182,976, plus prejudgment interest on 1) $212,000 from December 15, 1997, 2) $36,700 from December 31, 1997, and 3) $14,934,276 from January 12, 1998.

IT IS SO ORDERED.

Dated: September 18, 2008

_____
CHRISTINA A. SNYDER
UNITED STATES DISTRICT JUDGE